(C.D. 4217)

Koret of California *v.* United States

United States Customs Court, Second Division

(Decided May 14, 1971)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.
*L. Patrick Gray, III*, Assistant Attorney General (*Peter Jay Baskin, Herbert T. Posner*, and *Ralph A. Bontempo*, trial attorneys), for the defendant.

Before Rao, Chief Judge, Ford and Newman, Judges

Newman, Judge: At issue in these three consolidated protests is the proper rate of duty on certain merchandise invoiced as "portable storage baskets (steel)" imported from Canada in 1967 and entered at the port of Blaine, Washington.

The "baskets" were assessed with duty at the rate of 19 per centum ad valorem under the "catch-all" provision for "Other" articles of iron or steel, not coated or plated with precious metal, in item 657.20 of the Tariff Schedules of the United States (TSUS).

Plaintiff claims that the merchandise is properly dutiable at the rate of 10 per centum ad valorem under the provision in item 640.30, TSUS, for "Other" containers of base metal, chiefly used in the packing, transporting, or marketing of goods. An alternate claim in the protest under item 664.10, TSUS, was abandoned at the trial and is hereby dismissed.

We sustain plaintiff's claim under item 640.30, TSUS.

### STATUTES INVOLVED

Classified under:

Schedule 6, Part 3, Subpart G:

Subpart G headnotes:

> 1. This subpart covers only articles of metal which are not more specifically provided for elsewhere in the tariff schedules.
>
> \*     \*     \*     \*     \*     \*     \*
>
> Articles of iron or steel, not coated or plated with precious metal:
> > Cast-iron articles, not alloyed:
> >
> > \*     \*     \*     \*     \*     \*     \*
> >
> > Other articles:

|        |                    |              |
|--------|--------------------|--------------|
| \* \* \* | Of tin plate_____ | \* \* \* |
| 657.20 | Other _____ | 19% ad val. |

Claimed under:

Schedule 6, Part 3, Subpart A:

> Drums, flasks, casks, cans, boxes, lift vans, and other containers (except pressure containers in items 640.05 and 640.10 and collapsible tubes in item 640.40), all the foregoing, of base metal, chiefly used in the packing, transporting, or marketing of goods:

| | | |
|---|---|---|
| * * * | Of stainless steel_____ | * * * |
| * * * | Of aluminum and having a capacity of not over 5 gallons_____ | * * * |
| 640.30 | Other _____ | 10% ad val. |

## I.

At the trial of this case in San Francisco, California, and Seattle, Washington, plaintiff presented the testimony of four witnesses and introduced in evidence four exhibits. One witness testified on behalf of defendant.

Plaintiff's witnesses in San Francisco were: Douglas G. Whiteley, William C. Snyder, and Christian R. Steindl, respectively plaintiff's general manager; manager of operating services; and manager of sales promotion and advertising. Upon reopening its case in chief for further testimony in Seattle, where the case was retransferred pursuant to defendant's motion, plaintiff introduced the testimony of Francis N. Ehl, secretary-treasurer of Advance Wire Products, Ltd., the manufacturer of the imported merchandise.

Defendant's witness was Ed Beckett, traffic manager of Kenworth Motor Truck Company in Seattle, a manufacturer of heavy duty motor trucks, which utilized metal wire baskets for holding parts along its assembly line.

The facts are:

Koret of California is a manufacturer and merchandiser of what is known in the garment industry as "coordinated" women's sportswear. Such sportswear is a "mix and match array of uppers and lowers" that may be used together or separately, depending upon the desires of the consumer. Plaintiff's sportswear is manufactured at its various plants in the United States and then shipped to a distribution center at San Francisco.

When garments are received at Koret's distribution center, they are folded and packed in boxes or cartons, or occasionally arrive hanging in trucks. The cartons contain only skirts, or blouses, or sweaters, etc., and before the garments are shipped to retail customers, they must be "coordinated".

Coordinating the garments involves removing them from the cartons that come into the distribution center and sorting them according to size, style, and color for consolidation into outgoing orders so that the retailer has a full line of merchandise to offer his customers. In the coordinating process, the folded garments are placed into the imported "baskets" through which colors can be viewed as well as the size indications. In essence, the "baskets" serve as an "assembly device"

in the order filling process for the folded garments, just as the pipes with hangers serve for the assembly of the hanging garments. The "baskets" never leave the distribution center, and the garments, when shipped to customers, are packed in bulk containers, except for a few that are shipped on hangers.

The imported "basket" is made of heavy gauge wire and is enclosed on all sides except the front. The interior is divided into three sections which are spaced to accommodate the folded garments. Three hooks are provided on top so that the "basket" can be hung on flow rail racking, which thus converts hanging storage into immediate folded storage. When used on the racking, the "basket" travels on a conveyor system; however, the "basket" also is used on traveling towline conveyor trucks. The bottom of the "basket" is sloped to prevent garments from falling out while traveling through the plant. To facilitate its shipping to and storage at the distribution center when not in use, the "basket" is collapsible into a flat position.

It further appears that the imported "baskets" were custom-designed specifically for Koret's use at the distribution center.

## II.

Plaintiff contends that the imported articles are containers chiefly used in the marketing of goods. Hence, initially we shall consider whether the imports fall within the common meaning of the term "containers".

The meaning of a tariff term is presumed to be the same as its common or dictionary meaning in the absence of evidence to the contrary. *August Bentkamp* v. *United States*, 40 CCPA 70, 78, C.A.D. 500 (1952). *Webster's New International Dictionary* (1950) defines "container":

1. One who or anything that contains. * * *

Here, the imports serve to contain or store in a semi-enclosed and compartmentalized fashion the folded garments which were placed therein. Accordingly, we hold that such articles are "containers" within the common understanding of the term.

## III.

We must now determine whether plaintiff sustained its burden of establishing that the imports were chiefly used in the "marketing of goods".

The record establishes to our satisfaction that plaintiff's use of the "baskets" constituted the sole and exclusive use thereof in the United States. The testimony of plaintiff's witnesses demonstrated clearly

that the imports were unique and custom-made to Koret's specifications for use at its distribution center. Features which dedicated the articles to Koret's operation included: the gauge of the wire; the presence, size and location of the three hooks; the various reinforcing features; the module size and spacing of the permanently separated sections; the sloping bottom; the open front; and the collapsible feature for convenience of transportation and storage when not in use.

The wire baskets used by Kenworth Motor Truck Company on its assembly line for the manufacture of trucks, concerning which defendant's witness Beckett testified, were shown on cross-examination and by plaintiff's rebuttal testimony to be entirely different in physical specifications and use from those "baskets" used by plaintiff.

Under these circumstances, the only remaining question is whether the use established by plaintiff constitutes the "marketing of goods". Determination of this question requires consideration of the common meaning of the term "marketing". Plaintiff relies upon the following definitions of "marketing":

*Encyclopedia Americana* (1965 edition), Vol. 18 at page 299:

> MARKETING. Marketing is defined by the Committee on Definitions of the American Marketing Association as "the performance of business activities directed toward and incident to, the flow of goods and services from producer to consumer or user." Marketing, therefore, is made up on one hand of *such physical activities as transporting, storing, and selling goods*, and on the other hand of a series of decisions which must be reached by any organization undertaking any part of the process of moving goods from the producer to the user. [Emphasis added.]

*Encyclopaedia Britannica* (1963 edition), Vol. 14 at page 909:

> MARKETING. The *meaning of the term "marketing" has broadened considerably in the 20th century*. It is now generally understood to comprise all the activities involved in the movement of goods from producers to final consumers. It often includes some initial processing, but not treatments which change radically the nature of the product. For some products there may be several phases of marketing, as, for example, when metal is first offered raw in bales, then as spun yarn, later as cloth and finally as a shirt.[1] [Emphasis added.]

*Webster's Third New International Dictionary* (1963):

> * * * 3: an aggregate of functions involved in transferring title and in moving goods from producer to consumer

---

[1] This authority then discusses the various phases of marketing, as defined, including assembly of goods from different sources; distribution systems; transportation; storage facilities; grading, packaging, etc.

including among others buying, *selling*, *storing*, *transporting*, *standardizing*, financing, risk bearing, and supplying market information. [Emphasis added.]

Defendant does not dispute that the foregoing definitions are indicative of the common understanding of the term "marketing"; nor does defendant argue for any different construction of the term.

Although of course only advisory, plaintiff's witnesses testified concerning their understanding of the term "marketing", which collectively was to the effect that the marketing process commences with the analysis of consumer demand and runs through product design and development, sales and the shipping of goods to the customer, excluding only the manufacturing process.

The record herein indicates that plaintiff's distribution center (where the imports were exclusively utilized) functioned as a place where fully-manufactured women's sportswear was collected from divergent locations in the United States, and was separated, stored, coordinated and shipped to customers. The "baskets" played a vital role in the operation of the center by making it possible to store the folded sweaters, skirts, etc. separately by colors, styles, and sizes, and then to assemble the folded merchandise in a coordinated fashion. Such operation was shown to be essential to the sale of Koret's line of merchandise as "coordinated sportswear". Under these circumstances, and in light of the common meaning of the term "marketing", we hold that the "baskets" are containers chiefly used in the marketing of goods within the purview of item 640.30, TSUS, as claimed by plaintiff. Consequently, plaintiff's claim is sustained.

Judgment will be entered accordingly.